# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Richard Wilson, Michael J. Antoniak, Jr., Marsha L. Antoniak, Anita L. Belton, Prescott Darren Bosler, Johnny Calhoun, Sallie Calhoun, Cynthia Gary, Robert Wayne Gary, Eugene P. Lawton, Jr., Jeanette Norman, James Robert Shirley, Robert W. Spires, Crystal Spires Wiley, Lewis S. Williams, Janie Wiltshire, Benjamin Franklin Wofford, Jr., and Rebecca Hammond Wofford, Petitioners,

v.

Laura B. Willis and Jesse A. Dantice, individually and as agents and/or brokers for Southern Risk Insurance Services, LLC, Travelers Casualty Insurance Company of America, Allied Property and Casualty Insurance Company, Peerless Insurance Company, Montgomery Mutual Insurance Company, Safeco Insurance Company of America, and Foremost Insurance Company, Southern Risk Insurance Services, LLC, Travelers Casualty Insurance Company of America, Allied Property and Casualty Insurance Company, Peerless Insurance Company, Montgomery Mutual Insurance Company, Safeco Insurance Company of America, Foremost Insurance Company, and Laurie Williams, Defendants,

Of Whom Peerless Insurance Company, Montgomery Mutual Insurance Company, and Safeco Insurance Company of America are the Respondents,

and

Of Whom Laurie Williams is Petitioner.

Appellate Case No. 2016-001512

Appeal From Abbeville County
Eugene C. Griffith, Jr., Circuit Court Judge

Opinion No. 27879
Heard December 13, 2018 – Filed April 10, 2019

**REVERSED AND REMANDED**

Thomas E. Hite, Jr. and Anne Marie Hempy, both of Hite and Stone, Attorneys at Law, of Abbeville; Jane H. Merrill, of Hawthorne Merrill Law, LLC, of Greenwood; and Leslie A. Bailey, Public Justice, of Oakland, California, for Petitioners.

C. Mitchell Brown, William C. Wood, Jr., A. Mattison Bogan, all of Nelson Mullins Riley & Scarborough, LLP, of Columbia; and Robert C. Calamari, of Nelson Mullins Riley & Scarborough, LLP, of Myrtle Beach, for Respondents.

**CHIEF JUSTICE BEATTY:** The question before this Court is whether arbitration should be enforced against nonsignatories to a contract containing an arbitration clause. The circuit court denied the motion to compel arbitration. The court of appeals reversed and remanded, holding equitable estoppel should be applied to enforce arbitration against the nonsignatories. *Wilson v. Willis*, 416 S.C. 395, 786 S.E.2d 571 (Ct. App. 2016). We now reverse and remand for further proceedings, finding the circuit court properly denied the motion to compel arbitration.

# I. FACTUAL/PROCEDURAL HISTORY

This appeal arises out of fourteen lawsuits brought by various plaintiffs against (1) Laura Willis, an insurance agent; (2) Jesse Dantice, the insurance broker who hired Willis and made her the agent in charge of the insurance office; (3) their insurance agency, Southern Risk Insurance Services, LLC (Southern Risk), and (4) six insurance companies for which their office sold policies (the Insurers). The plaintiffs in the lawsuits were Willis's customers (the Insureds) and other insurance agents (the Agents) in competition with Willis and Southern Risk.

The Insureds filed twelve of the lawsuits, asserting claims against Willis, Dantice, and Southern Risk for, *inter alia*, violations of the Unfair Trade Practices Act (UTPA), common law unfair trade practices, fraud, and conversion. They also named the Insurers as defendants on a respondeat superior theory of liability for failing to adequately supervise or audit Willis and Southern Risk.

In general, the Insureds alleged (1) Willis engaged in fraudulent conduct, including forging insurance documents, taking cash payments, and converting the payments to her own use, resulting in the Insureds having either no coverage or reduced coverage; (2) Willis and the other defendants engaged in unfair and illegal tactics in an effort to "corner the retail insurance market" in Abbeville County; and (3) the defendants had a duty to investigate, train, and supervise Willis, "especially after she was fined, publicly reprimanded, and placed on probation for dishonesty by the South Carolina Insurance Commission in October 2011," or, in the alternative, Willis and/or Dantice acted with the express or implied permission of the other defendants.

The Agents—Richard Wilson and James Robert Shirley—filed the two remaining lawsuits. The Agents alleged Willis engaged in illegal business practices that effectively blocked them from the local market, resulting in a substantial loss of clients and revenue. They further asserted that Dantice, Southern Risk, and the Insurers had a duty to properly investigate, train, and supervise Willis, and also alleged the defendants either engaged in a civil conspiracy with Willis to destroy the businesses of other agents or failed to detect and stop Willis's wrongdoing. The Agents' claims included statutory and common law unfair trade practices, conspiracy, and tortious interference with existing and prospective contractual relations.

In their answers, the Insurers denied the majority of the substantive claims. None of the Insurers asserted the actions were subject to arbitration. Subsequently, however, three of the Insurers—Peerless Insurance Co., Montgomery Insurance Co.,

and Safeco Insurance Co. (hereinafter, Respondents)—filed motions to compel arbitration and dismiss the lawsuits. In support of their motions, Respondents asserted an arbitration clause contained in a 2010 agency contract (the Agency Agreement)[1] entered into by Respondents with Southern Risk should be enforced against the nonsignatory Insureds and Agents (collectively, Petitioners) on the theories that Petitioners were third-party beneficiaries to the contract or were equitably estopped from asserting their nonparty status. Respondents indicated the Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1–16 (2009), applied to the Agency Agreement and enforcement of its arbitration clause, as well as state law.

Respondents asserted equitable estoppel should preclude Petitioners' assertion of their nonsignatory status because Petitioners' claims were premised on duties that would not exist but for the Agency Agreement Respondents had with Southern Risk. Respondents maintained the Agency Agreement contained a broad provision requiring the parties to arbitrate any claims arising "in connection with the interpretation of th[e] Agreement, its performance or nonperformance." Based on the foregoing, they argued the nonsignatory Petitioners were bound by the arbitration clause contained in the Agency Agreement between Respondents and Southern Risk.

The circuit court denied the motions to compel arbitration. In concluding Respondents were not entitled to arbitration, the circuit court made the following findings: (1) there was no evidence of a valid contract requiring arbitration because the Agency Agreement was never signed by Southern Risk or, alternatively, the unsigned agreement was invalid because it violated the Statute of Frauds; (2) the arbitration clause was narrow in scope and inapplicable on its face to Petitioners' claims because the claims had no relation to and were not "in connection with the performance of the Agency Agreement," which, instead, controlled only the business

---

[1] The arbitration provision relied on by Respondents is located in paragraph 12.A of the Agency Agreement between Southern Risk and Respondents:

> If any dispute or disagreement arises in connection with the interpretation of this Agreement, its performance or nonperformance, its termination, the figures and calculations used or any nonpayment of accounts, the parties will make efforts to meet and settle their dispute in good faith informally. If the parties cannot agree on a written settlement to the dispute within 30 days after it arises, or within a longer period agreed upon by the parties in writing, then the matter in controversy, upon request of either party, will be settled by arbitration
> . . . .

relationship between Southern Risk and the Insurers, not the relationship between the Insureds and the Insurers; (3) the doctrine of equitable estoppel should not be used to enforce the arbitration clause against nonsignatories (i.e., Petitioners), as there was "absolutely no evidence whatsoever" they had consistently maintained the provisions of the Agency Agreement between Southern Risk and Respondents should be enforced to benefit them, they never sought any direct benefits from the Agency Agreement, and their claims against Respondents did not hinge on any rights found in the Agency Agreement but instead were grounded in principles recognized under South Carolina law; (4) South Carolina courts have declined to enforce arbitration provisions in cases of outrageous acts that are unforeseeable to reasonable consumers; and (5) Respondents waived any right to arbitration by delaying the assertion of their motion.  The circuit court denied Respondents' joint motion for reconsideration, which, *inter alia*, argued Petitioners were seeking to invoke the provisions of the Agency Agreement for Petitioners' direct benefit, contrary to the circuit court's finding, so Petitioners should be subject to the arbitration clause in the Agency Agreement, despite their status as nonsignatories.

The court of appeals reversed and remanded, concluding the circuit court erred in failing to grant Respondents' motions to compel arbitration.  The court of appeals held, in relevant part, that (1) the Agency Agreement (as well as its arbitration clause) was enforceable, despite the lack of Southern Risk's signature on the contract, because a contract accepted and acted on by the other party is enforceable, and the Agency Agreement did not violate the Statute of Frauds because the contract was for an indefinite term and, thus, could be performed within one year; (2) the arbitration provision was sufficiently broad to encompass the claims alleged; (3) Petitioners were equitably estopped from arguing that their status as nonsignatories to the Agency Agreement precluded enforcement of the arbitration provision because their "complaints seek to benefit from enforcement of other provisions in the 2010 Agency Agreement"; (4) claims such as fraudulent conduct and misrepresentation were not the types of illegal and outrageous acts that were considered unforeseeable to a reasonable consumer in the context of normal business dealings; and (5) Respondents did not waive their right to compel arbitration.

This Court has granted (1) a joint petition for a writ of certiorari filed by Petitioners (the Insureds and Agents), and (2) a separate petition filed by Laurie Williams (individually, Petitioner Williams).[2]

---

[2]  Petitioner Williams became involved in this case after she was in an accident with one of the Insureds (Cynthia Gary).

## II.  STANDARD OF REVIEW

Whether an arbitration agreement may be enforced against a nonsignatory to the agreement is a matter subject to de novo review by an appellate court.  *See Aiken v. World Fin. Corp. of S.C.*, 373 S.C. 144, 148, 644 S.E.2d 705, 707 (2007) (stating a determination of whether a claim is subject to arbitration is reviewed de novo); *Pearson v. Hilton Head Hosp.*, 400 S.C. 281, 286, 733 S.E.2d 597, 599 (Ct. App. 2012) (applying the de novo standard to a nonsignatory).  Under de novo review, a circuit court's factual findings will not be reversed on appeal if any evidence reasonably supports those findings.  *Aiken*, 373 S.C. at 148, 644 S.E.2d at 707; *accord Chassereau v. Global-Sun Pools, Inc.*, 373 S.C. 168, 644 S.E.2d 718 (2007); *Hodge v. UniHealth Post-Acute Care of Bamberg, LLC*, 422 S.C. 544, 813 S.E.2d 292 (Ct. App. 2018).

## III.  LAW/ANALYSIS

Petitioners herein[3] contend the court of appeals erred in enforcing the arbitration clause in the Agency Agreement between Southern Risk and Respondents, where they were neither parties nor signatories to the contract and seek no benefits under the contract, and the claims are not within the scope of the Agency Agreement's arbitration clause and bear no significant relationship to the Agency Agreement.

Petitioners assert the court of appeals applied the presumption in favor of arbitration to the threshold question of whether the arbitration clause binds them as nonsignatories, and this was inappropriate because arbitration is strictly a matter of consent, and the presumption applies only to an analysis of the scope of an agreement.  Petitioners further assert the court of appeals erroneously concluded the arbitration provision could be enforced against them based solely on an equitable estoppel theory, where Petitioners were unaware of the Agency Agreement, have

---

[3]  Petitioner Williams has filed a brief that joins in the issues presented by the remaining Petitioners, but also asserts two distinct questions of her own regarding a statutory arbitration exemption found in S.C. Code Ann. § 15-48-10(b)(4) (2005) and waiver.  For simplicity, any references to "Petitioners" shall include Petitioner Williams to the extent she has incorporated their arguments.

never sought to obtain any direct benefit under that contract, and seek only to vindicate their rights under South Carolina law.[4]

The FAA applies in state or federal court to any arbitration agreement involving interstate commerce, unless the parties contract otherwise.[5]  *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 538, 542 S.E.2d 360, 363 (2001).  The purpose of the FAA is "to make arbitration agreements as enforceable as other contracts, but not more so."  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967).  A party seeking to compel arbitration under the FAA must establish that (1) there is a valid agreement, and (2) the claims fall within the scope of the agreement.  *Carr v. Main Carr Dev., LLC*, 337 S.W.3d 489, 494 (Tex. App. 2011).

The consideration of contract validity is normally addressed applying general principles of state law governing the formation of contracts.  *Munoz*, 343 S.C. at 539, 542 S.E.2d at 364 ("General contract principles of state law apply to arbitration clauses governed by the FAA.").  "State law remains applicable if that law, whether legislative or judicial, arose to govern issues concerning the validity, recoverability, and enforceability of all contracts generally."  *Id.*; *see also* 9 U.S.C.A. § 2 (stating a written provision for arbitration in any contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract").  "A state law that places arbitration clauses on an unequal footing with contracts generally, however, is preempted if the FAA applies."  *Munoz*, 343 S.C. at 539, 542 S.E.2d at 364.

Although arbitration is viewed favorably by the courts, it is predicated on an agreement to arbitrate because parties are waiving their fundamental right to access to the courts.  *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (recognizing that arbitration under the FAA "is a matter of consent, not coercion" (citation omitted)); *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997) ("Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate."); *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 596, 553

---

[4]  Petitioners have effectively abandoned any challenge to the findings by the court of appeals that the contract between Southern Risk and Respondents was not invalid due to either (a) the lack of Southern Risk's signature or (b) the Statute of Frauds, and that Petitioners' claims do not involve outrageous conduct that would not be subject to arbitration.  In addition, Petitioners (with the exception of Petitioner Williams) do not contest the court of appeals' finding that Respondents' delay in seeking arbitration did not constitute waiver.

[5]  Application of the FAA has not been disputed in the appeal before this Court.

S.E.2d 110, 118 (2001) ("Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.").

The consideration of scope is evaluated under the "federal substantive law of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (stating section 2 of the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary," and noting "[t]he effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act").

"[T]he presumption in favor of arbitration applies to the scope of an arbitration agreement; it does not apply to the existence of such an agreement *or to the identity of the parties who may be bound* to such an agreement." *Carr*, 337 S.W.3d at 496 (emphasis added). "Even the exceptionally strong policy favoring arbitration cannot justify requiring litigants to forego a judicial remedy when they have not agreed to do so." *Id.*

Moreover, because arbitration, while favored, exists solely by agreement of the parties, a presumption *against* arbitration arises where the party resisting arbitration is a nonsignatory to the written agreement to arbitrate. *Global Pac., LLC v. Kirkpatrick*, 88 N.E.3d 431, 435 (Ohio Ct. App. 2017) ("Because no party can be required to submit to arbitration when it has not first agreed to do so, in a case where the party resisting arbitration is not a signatory to any written agreement to arbitrate, a presumption against arbitration arises."); *cf. Comer v. Micor, Inc.*, 436 F.3d 1098, 1103–04 (9th Cir. 2006) (noting "the general rule that a nonsignatory is not bound by an arbitration clause").

In the current matter, it is undisputed that Petitioners are nonsignatories to the arbitration agreement. Whether an arbitration agreement may be enforced against nonsignatories, and under what circumstances, is an issue controlled by state law.[6] *See Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 630–31, 630 n.5 (2009) (observing state law is applicable to determine which contracts are binding under section 2 of the FAA, and traditional principles of state law may permit a contract to be enforced by or against nonparties to a contract through theories of assumption, piercing the corporate veil, and estoppel, among others); *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1355 n.1 (11th Cir. 2017)

---

[6] The parties acknowledged during oral arguments before this Court that state law governs whether nonsignatories may be bound by arbitration agreements.

(citing *Arthur Andersen LLP* and noting state, not federal, law controls the analysis of equitable estoppel issues in the arbitration context); *Walker v. Collyer*, 9 N.E.3d 854, 858–59 (Mass. App. Ct. 2014) (relying on *Arthur Andersen LLP* and stating traditional principles of state contract law determine whether nonsignatories can be compelled to arbitrate).

South Carolina has recognized several theories that could bind nonsignatories to arbitration agreements under general principles of contract and agency law, including (1) incorporation by reference, (2) assumption, (3) agency, (4) veil piercing/alter ego, and (5) estoppel. *Malloy v. Thompson*, 409 S.C. 557, 561–62, 762 S.E.2d 690, 692 (2014);[7] *see also Pearson v. Hilton Head Hosp.*, 400 S.C. 281, 289, 733 S.E.2d 597, 601 (Ct. App. 2012) (discussing federal decisions setting forth five theories that could provide a basis to bind nonsignatories to arbitration agreements). These theories have also been applied extensively in the federal courts. *See, e.g.*, *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (enumerating five traditional theories for binding nonsignatories to arbitration clauses).

The court of appeals held the theory of equitable estoppel precluded Petitioners from asserting their nonsignatory status here and compelled them to submit their claims to arbitration. *Wilson v. Willis*, 416 S.C. 395, 418, 786 S.E.2d 571, 583 (Ct. App. 2016). In doing so, the court of appeals cited the framework for invoking equitable estoppel that has been utilized in the arbitration context by the federal courts and adopted by some state courts. *Id.* at 417, 786 S.E.2d at 582. This framework, often referred to as the direct benefits test, was utilized in a prior court of appeals decision, *Pearson*, which applied the federal test as set forth in *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411 (4th Cir. 2000).[8] Both *Pearson* and the Fourth Circuit decision were cited for

---

[7]  In *Malloy*, this Court noted that, in addition to the five theories enumerated above, some federal courts have also recognized that a third-party beneficiary of a contract containing an arbitration clause may be compelled into arbitration as a nonsignatory. *Malloy*, 409 S.C. at 562, 762 S.E.2d at 692 (citing *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347 (5th Cir. 2003)). *But see Comer*, 436 F.3d at 1102 ("A third party beneficiary might in certain circumstances have the power to sue under a contract; it certainly cannot be *bound* to a contract it did not sign or otherwise assent to.").

[8]  To the extent the decision in *Pearson* indicates federal, rather than state, law is controlling on whether equitable estoppel can bind nonsignatories, we take this

guidance by the court of appeals in the current matter, which was necessitated by the scarcity of state precedent in this regard. *See generally Wilson*, 416 S.C. at 416–18, 786 S.E.2d at 582–83.

Under direct benefits estoppel, "[a] nonsignatory is estopped from refusing to comply with an arbitration clause 'when it receives a direct benefit from a contract containing an arbitration clause.'" *Pearson*, 400 S.C. at 290, 733 S.E.2d at 601 (quoting *Int'l Paper Co.*, 206 F.3d at 418). "In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has *consistently maintained that other provisions of the same contract should be enforced to benefit him*."[9] *Id.* (quoting *Int'l Paper Co.*, 206 F.3d at 418).

---

opportunity to clarify that state law controls, per *Andersen*. Some jurisdictions have elected, as a matter of state law, to expressly adopt the federal test for equitable estoppel to promote consistency among state and federal courts in cases subject to the FAA. *See In re Kellogg Brown & Root*, 166 S.W.3d 732, 739 (Tex. 2005) (recognizing it is important for federal and state law to be as consistent as possible because federal and state courts have concurrent jurisdiction to enforce the FAA; the court stated its decision to apply the direct benefits test for equitable estoppel "rests on state law, but [] is informed by persuasive and well-reasoned federal precedent"); *see also Belzberg v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1133 (N.Y. 2013) (observing "[s]ome New York courts have relied on the direct benefits estoppel theory, derived from federal case law, to abrogate the general rule against binding nonsignatories"). Although some jurisdictions have adopted the federal test, discrepancies among jurisdictions remain on the subject of equitable estoppel. *See generally* Matthew Berg, *Equitable Estoppel to Compel Arbitration in New York: A Doctrine to Prevent Inequity*, 13 Cardozo J. of Conflict Resol. 169, 174 (2011) (observing "there are considerable disagreements over equitable estoppel theory within each particular state, among the states, and between the states and the federal government").

[9] Petitioners assert, as an alternative argument on appeal, that the traditional state test for equitable estoppel enumerates six factors for consideration, and they further argue the traditional state test has not been met here because they have not engaged in false or misleading conduct that caused injury to Respondents, nor have Respondents claimed they lacked knowledge of the facts in question, relied upon the conduct of Petitioners, and suffered a prejudicial change of position. The traditional test referenced by Petitioners has been analyzed most often in non-arbitration cases.

Stated another way, "[u]nder the direct benefits theory of estoppel, a nonsignatory may be compelled to arbitrate where the nonsignatory 'knowingly exploits' the benefits of an agreement containing an arbitration clause, and receives benefits flowing directly from the agreement . . . ."[10] *Belzberg v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1134 (N.Y. 2013).

The court of appeals found the prior South Carolina decision applying the direct benefits estoppel framework, *Pearson*, was analogous. In *Pearson*, an anesthesiologist (Dr. Pearson) was equitably estopped from asserting that, as a nonsignatory, he was not bound by an arbitration clause contained in a contract between a hospital and a medical professional placement company (Locum). *Pearson*, 400 S.C. at 296–97, 733 S.E.2d at 605. The court of appeals found Dr. Pearson received a benefit from the hospital's contract with Locum and should not be able to disclaim the arbitration agreement contained therein, where he was able to work at the hospital and receive payment for his work and, if not for the contract, Dr. Pearson would have had to make separate arrangements with the hospital to work there. *Id.* The court of appeals further noted that Dr. Pearson raised a claim for breach of contract against the defendants, not just Locum. *Id.* at 297, 733 S.E.2d at 605. Consequently, the court observed, Dr. Pearson was "seeking either to receive damages under Locum and the Hospital's contract, or to hold the Hospital accountable under his and Locum's contract." *Id.*

---

*See, e.g.*, *Rodarte v. Univ. of S.C.*, 419 S.C. 592, 799 S.E.2d 912 (2017); *Strickland v. Strickland*, 375 S.C. 76, 650 S.E.2d 465 (2007); *but see Zabinski*, 346 S.C. at 589, 553 S.E.2d at 114 (citing the six-part test in an arbitration case). We find this assertion is not properly before the Court, as the parties and both courts below focused their discussions on whether the direct benefits test for estoppel had been met. Consequently, we also apply the direct benefits test and express no opinion on Petitioner's alternative argument. *See Malloy*, 409 S.C. at 561, 762 S.E.2d at 692 (stating it is axiomatic that an issue cannot be raised for the first time on appeal).

[10] Direct benefits estoppel is distinguishable from a second theory of estoppel that has been discussed in some federal decisions and which applies when a nonsignatory is attempting to compel arbitration *against a signatory* to the contract containing the arbitration clause. *See generally Thomson-CSF*, 64 F.3d at 779. The theory compels a signatory to arbitrate with a nonsignatory due to the close relationship of the parties and the fact that the claims were founded in and intertwined with the underlying contractual obligations. *Id.*

Citing the analysis in *Pearson*, the court of appeals reasoned here that, "although the Insureds and Agents [Petitioners] admittedly did not see the 2010 Agency Agreement prior to bringing this action, this does not control our inquiry because the allegations in the complaints necessarily depend upon the terms, authority, and duties created and imposed by that agreement." *Wilson*, 416 S.C. at 417, 786 S.E.2d at 582. In other words, the court stated, while Petitioners "do not expressly rely upon other provisions in the 2010 Agency Agreement," they rely upon the relationship the contract established between Respondents and Southern Risk to assert their claims. *Id.* at 417–18, 786 S.E.2d at 582–83. The court stated the duties Petitioners contend Respondents allegedly breached arose from the Agency Agreement, so Petitioners received a "direct benefit" from that contract. *Id.* at 418, 786 S.E.2d at 583. As a result, the court of appeals held, Petitioners were "equitably estopped from arguing their status as nonsignatories precludes enforcement of the arbitration provision where their complaints seek to benefit from the enforcement of other provisions in the 2010 Agency Agreement." *Id.*

Petitioners contend the Agency Agreement, by its own terms, applied only to the individual Insurers and to Southern Risk, the parties to the contract. Petitioners point out that they have not alleged a claim for breach of contract, and they were not even aware of the existence of the contract between Respondents and Southern Risk until Respondents decided to seek arbitration nearly a year into the litigation. Petitioners maintain the "sole basis" of the court of appeals' ruling that they could be subject to the arbitration clause as nonsignatories was the court of appeals' reliance on the doctrine of equitable estoppel and its finding they were seeking direct benefits under the contract.

We agree with Petitioners that the circumstances in *Pearson* are distinguishable. Unlike Dr. Pearson, Petitioners did not embrace the Agency Agreement during the life of the contract and then, during litigation, attempt to repudiate the arbitration clause in the contract. It is undisputed that Petitioners were never aware of the existence of the contract until they brought their tort actions against Respondents. General principles of South Carolina law form the basis for most of Petitioners' claims. For example, Petitioners' allegation that Respondents possibly conspired with Willis and others to commit fraud is misconduct that does not arise from the contract. To hold otherwise would arguably allow Respondents to commit unfair trade practices and conspire to destroy the businesses of other insurance agencies while shielding themselves from the possibility of a jury trial with an arbitration clause agreed to only by the conspiring parties.

Respondents and the court of appeals appear to rely on the fact that some of the claims asserted by Petitioners, concerning the failure to issue policies and the

principle of respondeat superior, would not have arisen in the absence of the Agency Agreement between Southern Risk and Respondents. However, direct benefits estoppel is not implicated simply because a claim relates to or would not have arisen "but for" a contract's existence:

> When a claim depends on the contract's existence and cannot stand independently—that is, the alleged liability "arises solely from the contract or must be determined by reference to it"—equity prevents a person from avoiding the arbitration clause that was part of that agreement. But "when the substance of the claim arises from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law," direct-benefits estoppel is not implicated even if the claim refers to or relates to the contract *or would not have arisen "but for" the contract's existence*.

*Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 637 (Tex. 2018) (emphasis added) (footnotes omitted).

It is important to distinguish direct benefits from indirect benefits because when the benefits to a nonsignatory are merely indirect, arbitration cannot be compelled. *Belzberg*, 999 N.E.2d at 1134. A benefit is direct if it flows directly from the agreement. *Id.*; *see also MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001) (stating direct benefits estoppel requires that a nonsignatory knowingly accept the benefits of an agreement with an arbitration clause in order to be bound by an arbitration clause).

In contrast, any benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relationship of the parties, but does not exploit (and thereby assume) the agreement itself. *MAG Portfolio Consult*, 268 F.3d at 61; *accord Belzberg*, 999 N.E.2d at 1134; *cf. Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1172 (11th Cir. 2011) (observing that, under Georgia law, a plaintiff's claims must be directly, not just indirectly, based on the contract containing the arbitration clause for equitable estoppel to compel arbitration of those claims); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740–41 (Tex. 2005) (stating that, under direct benefits estoppel, although a nonsignatory's claim may relate to a contract containing an arbitration provision, that relationship does not, in itself, bind the nonsignatory to arbitration, and a nonsignatory plaintiff cannot be compelled to arbitrate on the sole ground that, but for the contract containing the arbitration provision, it would have no basis to sue; rather, a nonsignatory should be compelled to arbitrate a claim only if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision).

Although the distinction between direct and indirect benefits is not always readily discernable, a few examples help illustrate its application in the estoppel context. As noted above, in the South Carolina case of *Pearson*, Dr. Pearson clearly received a direct benefit from the hospital's contract with another entity because Dr. Pearson was able to work at the hospital and receive payment for his work due to the contract containing the arbitration clause. *Pearson*, 400 S.C. at 296–97, 733 S.E.2d at 605. In addition, where plaintiffs sue and seek relief based on contracts containing arbitration clauses, courts have applied equitable estoppel. *See generally Int'l Paper Co.*, 206 F.3d at 417–18 (applying equitable estoppel and holding the nonsignatory plaintiff could not bring claims to enforce the guarantees and warranties issued by the defendant in a contract with another party without complying with an arbitration provision contained in that contract).

In *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060 (2d Cir. 1993), the United States Court of Appeals for the Second Circuit held that a nonsignatory entity, which knowingly used a trade name pursuant to an agreement that it received but did not object to, was estopped from relying on its nonsignatory status to avoid the agreement's arbitration clause. In another decision from the Second Circuit, the court found nonsignatory boat owners to a contract under which they received significantly lower insurance rates and the ability to sail under the French flag had received direct benefits from the contract and, therefore, could not avoid the contract's arbitration provision. *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999).

In our view, Petitioners have not knowingly exploited and received a direct benefit from the Agency Agreement. As originally found by the circuit court, the Agency Agreement executed by Southern Risk and the Insurers was purely for the benefit of the parties to the contract in outlining their business relationships and the rights of the parties to the Agency Agreement. Petitioners have not attempted to procure any direct benefit from the Agency Agreement itself while attempting to avoid its arbitration provision. Moreover, Respondents have not argued that the Agency Agreement, by its express terms, was applicable to other parties, or that customers of Southern Risk knew when they purchased their insurance policies that any claims of fraud, unfair trade practices, etc., would be subjected to an arbitration provision in an agreement between other parties.

Equitable estoppel is, ultimately, a theory designed to prevent injustice, and it should be used sparingly. *See Hirsch v. Amper Fin. Servs., LLC*, 71 A.3d 849, 852 (N.J. 2013) (observing equitable estoppel should be used sparingly to compel arbitration and noting it "is more properly viewed as a shield to prevent injustice rather than a sword to compel arbitration"); 28 Am. Jur. 2d *Estoppel and*

*Waiver* § 29 (2011) (stating equitable estoppel should be used with restraint and only in exceptional circumstances). We decline to impose it on Petitioners, a group that includes not only customers of Southern Risk, but also competing agents and an individual injured by a customer who purchased a policy from Southern Risk. Considerations of equity do not warrant estopping such attenuated individuals from asserting their nonsignatory status.

Having found Petitioners should not be compelled to arbitrate their claims based on equitable estoppel, we need not address the parties' remaining questions. *See Earthscapes Unlimited, Inc. v. Ulbrich,* 390 S.C. 609, 617, 703 S.E.2d 221, 225 (2010) (holding an appellate court need not address remaining issues on appeal when disposition of a prior issue is dispositive).

## IV. CONCLUSION

We conclude equitable estoppel should not be applied to compel the nonsignatory Petitioners to arbitrate their claims. Accordingly, we reverse the decision of the court of appeals and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

**KITTREDGE, HEARN, FEW and JAMES, JJ., concur.**